# UNITED STATES COURT OF APPEALS

**FILED**
United States Court of Appeals
Tenth Circuit

## FOR THE TENTH CIRCUIT

FEB 3 - 2005

**PATRICK FISHER**
Clerk

KENNETH MICHAEL TRENTADUE,
The Estate of by and through its
Personal Representative Carmen
Aguilar, et al,

        Plaintiff-Appellee/Cross-
        Appellant,

v.

STUART LEE, et al.,

        Defendant-Appellant/Cross-
        Appellee,

Nos. 01-6444, 02-6037
02-6030 and 02-6051

## ORDER

Before **O'BRIEN**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**TYMKOVICH**, Circuit Judge.

The petitions for panel rehearing filed on November 9, 2004, November 26,

2004, and December 27, 2004, are granted in part. A revised opinion is attached.

The petitions for rehearing en banc was transmitted to all of the judges of

the court who are in regular active service as required by Fed. R. App. P. 35. As

no member of the panel and no judge in regular active service on the court

requested that the court be polled, the petitions are denied. Judge McConnell did not participate.

Entered for the Court
Patrick J. Fisher, Clerk

By: *[signature]*
Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

FEB 3 2005

PATRICK FISHER
Clerk

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

KENNETH MICHAEL TRENTADUE,
The Estate of by and through its
Personal Representative Carmen
Aguilar,

      Plaintiff-Appellee/Cross-
      Appellant,

and

CARMEN AGUILAR TRENTADUE,
individually and as Personal
Representative for the Estate of
Kenneth Michael Trentadue and
Guardian Ad Litem for Vito Miguel
Trentadue; WILMA LOU
TRENTADUE; JESSE JAMES
TRENTADUE; DONNA
TRENTADUE SWEENEY; LEE
FREDERICK TRENTADUE; JESSE
CARL TRENTADUE,

      Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA;
DEPARTMENT OF JUSTICE;
FEDERAL BUREAU OF PRISONS;
FEDERAL BUREAU OF
INVESTIGATION,

      Defendants,

Nos. 01-6444 and 02-6037

STUART LEE,

    Defendant-Appellant/Cross-Appellee,

KENNETH FREEMAN,

    Defendant-Cross-Appellee.

———————————

UNITED STATES OF AMERICA,

    Amicus Curiae.

———————————

KENNETH MICHAEL TRENTADUE,
The Estate of by and through its
Personal Representative Carmen
Aguilar; CARMEN AGUILAR
TRENTADUE, individually and as
Personal Representative for the Estate
of Kenneth Michael Trentadue and
Guardian Ad Litem for Vito Miguel
Trentadue; WILMA LOU
TRENTADUE; JESSE JAMES
TRENTADUE; DONNA
TRENTADUE SWEENEY; LEE
FREDERICK TRENTADUE; JESSE
CARL TRENTADUE,

    Plaintiffs-Appellees/Cross -
    Appellants,

v.

UNITED STATES OF AMERICA,

    Defendant-Appellant/Cross-
    Appellee,

Nos. 02-6030 and 02-6051

and

DEPARTMENT OF JUSTICE;
FEDERAL BUREAU OF PRISONS;
FEDERAL BUREAU OF
INVESTIGATION; STUART LEE,

Defendants.

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA
### (D.C. NO. 97 849 F)

Michael E. Robinson, Department of Justice (Robert D. McCallum, Jr., Assistant Attorney General, Robert G. McCampbell, United States Attorney, and Robert S. Greenspan, Attorney, Department of Justice, with him on the briefs), Washington, D.C., for Defendants-Appellants/Cross-Appellees United States of America, Department of Justice, Federal Bureau of Prisons, and Federal Bureau of Investigations, and for Amicus Curiae United States in support of Stuart Lee.

Robert D. Baron (Gloyd McCoy with him on the brief), Coyle, McCoy & Burton, Oklahoma City, Oklahoma, for Defendant-Appellant/Cross-Appellee Stuart Lee.

Charles P. Sampson, Suitter Axland (Joe B. Reynolds and R. Scott Adams, Adams & Associates, Oklahoma City, Oklahoma, with him on the briefs) Salt Lake City, Utah, for Plaintiffs-Appellees/Cross-Appellants.

Barry W. Nance, Kenneth R. Nance, filed a brief for Cross-Appellee Kenneth Freeman.

Before **O'BRIEN,** Circuit Judge, **BRORBY,** Senior Circuit Judge, and **TYMKOVICH,** Circuit Judge.

**TYMKOVICH,** Circuit Judge.

-3-

The United States appeals from an adverse judgment awarding the Estate of Kenneth M. Trentadue and members of Trentadue's family $1.1 million in damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80 (2000), for the intentional infliction of emotional distress following Trentadue's death at a federal detention center in Oklahoma. Prison official Stuart A. Lee appeals the judgment entered on a jury verdict finding him liable for deliberate indifference to Trentadue's medical needs under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Estate and family members (Trentadues or plaintiffs) in turn raise twenty-one issues on cross-appeal. They primarily contend that the district court committed clear error in finding Trentadue committed suicide in his prison cell and in finding that federal officials did not engage in the intentional destruction of evidence.

The principal issues presented by the government's appeal are (1) whether plaintiffs have exhausted the FTCA's notice requirements; (2) whether the FTCA's misrepresentation exception bars plaintiffs' intentional infliction of emotional distress claim; (3) whether plaintiffs have satisfied the elements of intentional infliction of emotional distress under Oklahoma law; and (4) whether the FTCA's judgment bar provision precludes imposition of the *Bivens* judgment

against Lee.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.

## I. Background

### A. Introduction

Kenneth M. Trentadue was arrested in California in June 1995 for driving while intoxicated.  During the booking procedure police determined that Trentadue had an outstanding warrant based on federal parole violations committed after his 1988 release from prison, where he had served six years for bank robbery.  He was arrested for these parole violations and held in local jails for the next few weeks.

On August 18, 1995, the Bureau of Prisons (BOP) sent Trentadue to the Federal Transfer Center (FTC) in Oklahoma City for a parole revocation hearing. Upon arrival, Trentadue was placed in the Parole Violator's Unit of the prison where he made several calls to family members and assured them he would not be at the FTC long.  Two days later, on August 20, Trentadue asked to be placed in protective custody and prison officials moved him to a cell in the prison's Special Housing Unit (SHU).  At 3:02 a.m. the following morning, guards found Trentadue's blood-soaked body in his cell hanging from a noose made of torn bed sheets.  He was pronounced dead a few minutes later.

The circumstances surrounding Trentadue's death raise troubling questions. Trentadue's family maintains Trentadue was murdered by prison guards or another inmate, and claims prison officials acted to cover up the suspicious nature of his death by destroying evidence and cleaning his cell before an investigation could be completed. They also allege prison officials were deliberately indifferent to Trentadue's medical needs as guards waited several minutes to open the cell door and cut Trentadue's noose. The government disputes this version of the events, claiming Trentadue's wounds were self-inflicted and asserting he was dead by the time guards discovered him.

### B. Trentadue's Death

On the morning of August 20, 1995, two days after arriving at the FTC, Trentadue filled out an administrative form requesting admission to the SHU. He stated on the form that he believed other inmates were "out to get him" and that he was requesting admission for his own protection. After a strip search and physical inspection, officers noted only that Trentadue had a blister on his heel, and placed him in a cell alone at approximately 8:00 a.m. FTC records from August 20 indicate that other inmates were housed nearby Trentadue in the SHU, but the records contain no reports of abnormal activity.

Officers conducting a routine cell check saw Trentadue asleep in his bed at 2:38 a.m. the following morning. There were no indications that anything was

-6-

amiss at that time as officers saw no signs of blood or torn bed sheets. FTC records indicate the next cell check occurred twenty-four minutes later, at 3:02 a.m., at which time Officers Ellis and Creasey discovered Trentadue hanging in his cell by a ligature made of torn bed sheets. Officer Ellis radioed the prison control center: "I have one hanging," and an emergency message was broadcast throughout the FTC.

The emergency message prompted a flurry of activity within the prison. Lieutenant Stuart A. Lee, the highest ranking officer in the FTC during the relevant period, was in the control center when guards discovered Trentadue. Lieutenant Lee immediately departed for the SHU and on the way radioed the prison physician assistant to report to Trentadue's cell. Lee also radioed Officer Ellis and instructed him not to go into the cell and not to unlock the door.

Lieutenant Lee and other officers arrived at the cell two to three minutes after receiving the initial radio call. Lee looked through the cell door window and saw Trentadue hanging from a vent in the ceiling, blood on his body and blood on the floor. Lee testified that Trentadue's eyes were closed "as if he was in a deep sleep" and that he was pale and "silently still." Based on these observations, Lee concluded that Trentadue was already dead and did not immediately open the cell door. Some of the delay was also apparently due to Lee's decision to videotape

-7-

the cell entry and the need to obtain scissors from the control center to cut the noose.

Once inside the cell, officers did not immediately cut Trentadue down nor did they attempt to lift him in order to relieve pressure on his neck. When Trentadue was finally lowered to the ground the physician assistant conducted a cursory physical examination and determined that Trentadue was dead. No one attempted CPR. FTC records show that Trentadue's body was removed from his cell to the prison infirmary at 3:10 a.m., eight minutes after officers discovered him hanging.

### C. The Initial Investigation and Autopsy

The FTC official responsible for investigating inmate deaths, Special Investigative Supervisor Lieutenant Kenneth Freeman, was notified of Trentadue's death shortly after his body was removed from the SHU. Lieutenant Freeman's official duties included securing potential crime scenes and collecting and preserving evidence. At trial he testified that he did not consider Trentadue's cell a crime scene because prison officials told him Trentadue committed suicide. As a result, Freeman's investigation of the cell was perfunctory. He arrived at the FTC at approximately 5:30 a.m. and attempted to photograph everything in the cell with blood on it. He collected some physical evidence from the cell, including several of Trentadue's bloodstained personal items, and later

photographed Trentadue's body in the infirmary.  After Freeman completed his investigation, FTC officials ordered Trentadue's cell cleaned by prison staff. Both the cell and the infirmary were clean by early afternoon.

Shortly thereafter Trentadue's body was transferred to the Oklahoma Medical Examiner's Office.  The Chief Medical Examiner of the State of Oklahoma, Dr. Fred Jordan, completed an autopsy report that afternoon.  He documented numerous injuries to Trentadue's body, including multiple contusions on the head, arms, back, and legs; a bruised anal verge; lacerations on the head and neck; a small fracture to a neck bone; and several skin abrasions.  Because of these extensive injuries, Dr. Jordan initially listed the manner of death as "pending," and later classified it as "unknown."

### D. The Treatment of the Family

The FTC's acting warden, Marie Carter, called Trentadue's mother the morning of his death, as Trentadue had listed her as his next of kin upon being committed to the FTC.  Warden Carter testified that she told Wilma Trentadue her son had died of an apparent suicide and that BOP would be performing an autopsy with the family's concurrence.  Wilma Trentadue told Carter that only Trentadue's wife, Carmen, could give permission for such a procedure.  Carmen Trentadue testified that she spoke with Warden Carter that morning but never consented to an autopsy.

Later that day, Warden Carter spoke with Trentadue's brother, Jesse
Trentadue, a lawyer, who insisted on handling all matters relating to his brother's
death. During this conversation Jesse Trentadue asked BOP to conduct an
autopsy, but Carter told him no autopsy could be performed without Wilma
Trentadue's written authorization as next of kin. Despite this statement, the
record is clear that prison officials had already authorized the medical examiner's
autopsy and that it was completed by the afternoon of August 21.

The next day, August 22, Jesse Trentadue faxed a letter to Warden Carter.
He reiterated that he wanted to handle his brother's affairs, told BOP an autopsy
authorization was forthcoming, and requested information regarding the details of
his brother's death, including any evidence suggesting the cause was other than
suicide. Jesse received no response to these inquiries. The district court found
that BOP never notified Trentadue's family an autopsy had in fact been performed
and never told the family about the obvious and extensive trauma to Trentadue's
body. Jesse testified: "I was never told that he had any injuries at all."

E. The Body Is Shipped To California

On August 26, the medical examiner shipped Trentadue's remains to a
California funeral home. Trentadue's wife, mother and sister were present when
the body arrived. Upon opening the casket, the family members saw the autopsy
incisions and numerous bruises and lacerations on Trentadue's body. These

-10-

injuries were unexpected, so they had the body removed from the casket and photographed by funeral home employees.  Trentadue's wife told Jesse Trentadue and other family members about the body's condition later that same day.

On September 1, the FTC issued a press release regarding Trentadue's death.  It stated that the Oklahoma Medical Examiner had tentatively ruled the death a suicide and that Trentadue's injuries were the result of his persistent attempts to harm himself.  This press release conflicted with the facts then known to BOP.  As previously noted, the medical examiner had listed the cause of death as "unknown," not suicide.  The press release was the first time the Trentadues heard of an official investigation into their relative's death.

### F. The Subsequent Investigations

Trentadue's death spawned a number of federal and local investigations. The BOP conducted an initial internal investigation in the months following Trentadue's death, but its investigation ended soon after the FBI's Oklahoma Field Office opened a criminal investigation into the death in late 1995.  The FBI investigation continued at a slow pace for the next several months.  Trentadue's family and the Oklahoma Medical Examiner, suspicious of the way the federal government was handling the case, raised numerous questions about the manner and circumstances of Trentadue's death.  In response to these questions, the Criminal Section of the United States Department of Justice, Civil Rights

-11-

Division, began to supervise the investigation, and in early 1996, determined that the matter warranted presentation to a federal grand jury. The FBI conducted numerous witness interviews, which the Department of Justice (DOJ) presented along with other evidence to the grand jury. After several months of grand jury proceedings, DOJ issued a press release stating that the investigation revealed no credible evidence that FTC personnel had violated Trentadue's civil rights, and no evidence that Trentadue had been murdered.

After the grand jury proceedings, the DOJ Office of the Inspector General commenced its own inquiry into Trentadue's death. Like the Civil Rights Division, it concluded the evidence showed Trentadue had committed suicide, but found serious deficiencies in BOP's response to his death. Among other things, it noted that FTC's investigation of the incident was inadequate and that FTC personnel had misplaced or altered crucial evidence.

The Oklahoma City Police Department also conducted an investigation at the urging of the Oklahoma City District Attorney. The District Attorney concluded, based on its independent review of the matter, that Trentadue's death was a suicide and that he had not been beaten and murdered by correctional officers or inmates. Following this investigation, the medical examiner, Dr. Jordan, changed the manner of death in his autopsy report from "unknown" to "suicide," and identified the cause of death as "traumatic asphyxia."

## G. Course of Proceedings

In August 1996, Trentadue's estate filed an administrative claim with the DOJ. The claim generally was based on the belief that prison guards had murdered Trentadue, and included a claim for damages for intentional infliction of emotional distress based on prison officials' attempt to conceal the manner of his death. DOJ denied the administrative claim.

Thereafter, Trentadue's estate and members of his family filed this action against the United States, the DOJ, the BOP, and the FBI, and against twelve prison officials and employees in their individual capacities. Among other claims, the Trentadues brought a claim against the government under the FTCA for intentional infliction of emotional distress. Plaintiffs' amended complaint asserted that the government:

> engaged in extreme acts of misconduct such as, but not limited to concealing the manner and circumstances of Kenneth Michael Trentadue's death, the mutilation of Kenneth Michael Trentadue's body, falsely asserting that Kenneth Michael Trentadue had committed suicide, saying that the injuries and trauma upon Kenneth Michael Trentadue's body [were] self-inflicted or implying that those injuries had been done by his family following death, stating that Kenneth Michael Trentadue had killed himself because he had AIDS, and other illegal and wrongful acts.

Plaintiffs alleged "[t]hese and other acts" by the government "were so outrageous and extreme as to exceed all bounds of what is tolerated in a civilized

-13-

community." Their complaint also asserted civil rights violations by Lieutenants Lee and Freeman under *Bivens*.[1]

Before trial, the district court granted summary judgment to Freeman on the basis of qualified immunity. The district court tried the FTCA action and remaining *Bivens* claims against Lee together; the FTCA action was tried to the bench and the *Bivens* claims presented to a jury. After a four-week trial, the jury in the *Bivens* case returned a verdict finding Lee liable for violating Trentadue's civil rights by being deliberately indifferent to his serious medical needs, and awarded the plaintiffs $20,000 in compensatory damages. The jury rejected all of plaintiffs' remaining *Bivens* claims.

Five months later, the district court in the FTCA action entered judgment against the government for intentional infliction of emotional distress, and awarded plaintiffs $1.1 million in damages.[2] The court found against plaintiffs on all other FTCA claims. The government's motion to amend the judgment was denied.

---

[1] In addition, the amended complaint alleged that the government committed assault and battery resulting in Trentadue's injuries and death, was negligent in failing to provide for Trentadue's safety and not immediately administering to his medical needs, intentionally destroyed or altered evidence in order to conceal the manner and circumstances of his death, engaged in a conspiracy to violate his constitutional rights, and committed various statutory torts under Oklahoma law.

[2] The district court awarded Trentadue's wife $250,000, his mother and three siblings $200,000 each, and his deceased father's estate $50,000.

Both the government and Lee filed timely notices of appeal.

## II. FTCA

The FTCA constitutes a limited waiver of the federal government's sovereign immunity from private suit. *See* 28 U.S.C. § 1346(b). The prerequisite for liability under the FTCA is a "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* The government and Lee raise a total of four issues on appeal with regard to the district court's award of damages under the FTCA. The issues involve (a) the notice of claim; (b) the misrepresentation exception to the FTCA; (c) the application of the tort of intentional infliction of emotional distress; and (d) the judgment bar to the FTCA.[3]

### A. Notice of the Claim

---

[3] We note up front that circuit courts have allowed cases involving emotional distress under the FTCA. *See, e.g., Jimenez-Nieves v. United States*, 682 F.2d 1 (1st Cir. 1982); *Kohn v. United States*, 680 F.2d 922 (2d Cir. 1982); *Plummer v. United States*, 580 F.2d 72 (3d Cir. 1978); *Andrews v. United States*, 732 F.2d 366 (4th Cir. 1984); *Truman v. United States*, 26 F.3d 592 (5th Cir. 1994); *McLean v. United States*, 613 F.2d 603 (5th Cir. 1980); *Ferguson v. United States Army*, 938 F.2d 55 (6th Cir. 1991); *Gross v. United States*, 676 F.2d 295 (8th Cir. 1982); *Sabow v. United States*, 93 F.3d 1445 (9th Cir. 1996). In any event, the government has not claimed in this appeal that the tort of intentional infliction of emotional distress is per se unavailable under the FTCA.

The first issue is whether plaintiffs' administrative claim satisfied the FTCA's notice requirements. "Because the FTCA constitutes a waiver of the government's sovereign immunity, the notice requirements established by the FTCA must be strictly construed. The requirements are jurisdictional and cannot be waived." *Bradley v. United States ex rel. Veterans Admin.*, 951 F.2d 268, 270 (10th Cir. 1991) (citation omitted).

The jurisdictional statute, 28 U.S.C. § 2675(a), "requires that claims for damages against the government be presented to the appropriate federal agency by filing '(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim.'" *Bradley*, 951 F.2d at 270 (quoting *Warren v. United States Dep't of Interior Bureau of Land Mgmt.*, 724 F.2d 776, 780 (9th Cir. 1984)). Whether the district court has subject matter jurisdiction over a claim is a question of law we review de novo. *Id.*

The plaintiffs' administrative claim in this case included an intentional infliction of emotional distress claim and specified the damages sought. Nonetheless, the government contends the claim was insufficient in that it was based on a theory that prison officials had murdered Trentadue and did not discuss the specific grounds relied on by the district court in awarding damages, namely, the government's treatment of the Trentadue family in the aftermath of

-16-

his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval.  We disagree with the government's position.

In *Dynamic Image Technologies, Inc. v. United States*, the First Circuit described the test under § 2675(a) as "an eminently pragmatic one: as long as the language of an administrative claim serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought, it fulfills the notice-of-claim requirement." 221 F.3d 34, 40 (1st Cir. 2000).  Several courts in this jurisdiction have similarly interpreted the provision to require notice of the facts and circumstances underlying a claim rather than the exact grounds upon which plaintiff seeks to hold the government liable.  *See Barnson v. United States*, 531 F. Supp. 614, 623 (D. Utah 1982) ("[A] claim is sufficient which notifies the agency of the facts of the incident and need not elaborate all possible causes of action or theories of liability."); *see also Mellor v. United States*, 484 F. Supp. 641, 642 (D. Utah 1978) ("The purpose of the administrative claim procedure is to allow the agency to expedite the claims procedure and avoid unnecessary litigation by providing a relatively informal nonjudicial resolution of the claim.").  We agree that the FTCA's notice requirements should not be interpreted inflexibly.  *See Dynamic Image*, 221 F.3d at 40.

-17-

Applying these standards here, we conclude that plaintiffs' administrative claim provided notice that DOJ should investigate the prison officials' conduct. Plaintiffs' complaint sought damages based on the government's "extreme acts of misconduct," including the mutilation of Trentadue's body, the assertion that Trentadue's family caused his injuries, and the statement that Trentadue killed himself because he had AIDS. The complaint further stated that "[t]hese and other acts . . . were so extreme as to exceed all bounds of what is tolerated in a civilized community." This language gave DOJ notice of the facts and circumstances surrounding plaintiffs' emotional distress claim and, moreover, is consistent with plaintiffs' subsequent allegations in their amended complaint.

The government nevertheless argues that *Dynamic Image* requires a different outcome. There, plaintiff filed an administrative claim for damages with the United States Postal Service following his forcible removal from a postal service trade show. *Dynamic Image*, 221 F.3d at 36. In the claim he alleged "negligent misrepresentation, libel, slander, intentional interference with contractual relations, and discrimination under 42 U.S.C. § 1983." *Id.* He then brought claims under the FTCA for false arrest, intentional infliction of emotional distress and negligent supervision. *Id.* at 37. Because those causes of action were based on an incident not mentioned in plaintiff's administrative claim, the First Circuit held that the agency was not put on notice that it should investigate the

-18-

potentially tortious conduct, and dismissed the complaint for lack of subject matter jurisdiction. *Id.* at 40-41. In contrast, here, the plaintiffs' administrative claim specifically included a claim for intentional infliction of emotional distress and was based on the same underlying conduct that supported their amended complaint.

Because we conclude plaintiffs' administrative claim provided the government with sufficient notice of their intentional infliction of emotional distress claim, the district court did not lack jurisdiction under § 2675(a) of the FTCA.

### B. Misrepresentation Exception

The second issue on appeal involves the FTCA's intentional torts exception. *See* 28 U.S.C. § 2680(h).[4] If a claim against the government falls within an exception to the FTCA, the cause of action must be dismissed for want of federal subject matter jurisdiction. *See Dalehite v. United States*, 346 U.S. 15, 31 (1953) (holding that where discretionary function exception of § 2680(a) applied, district court lacked subject matter jurisdiction over cause of action), *partially overruled on other grounds by Rayonier, Inc. v. United States*, 352 U.S.

---

[4] Section 2680(h) provides that the FTCA does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

-19-

315 (1957); *Tippett v. United States*, 108 F.3d 1194, 1196 (10th Cir. 1997) (also

holding no subject matter jurisdiction where § 2680(a) applied); *see also*

*Hydrogen Technology Corp. v. United States*, 831 F.2d 1155, 1161 (1st Cir. 1987)

("[B]ecause 28 U.S.C. § 1346(b) provides that federal courts shall have

jurisdiction over FTCA claims '*subject to*,' . . . section 2680, the exceptions

found in that section define the limits of federal subject matter jurisdiction in this

area."). Application of the misrepresentation exception therefore presents a

threshold jurisdictional determination which we review de novo. *See Daigle v.*

*Shell Oil Co.*, 972 F.2d 1527, 1537 (10th Cir. 1992).

Section 2680(h) provides that the FTCA does not apply to claims "arising

out of" misrepresentation or deceit. The government argues plaintiffs' emotional

distress claim falls within the misrepresentation exception because the district

court found that the Trentadues suffered damages when the government failed to

communicate certain facts to the family, namely, the battered condition of

Trentadue's body and that an autopsy had been performed. The government

contends that plaintiffs can point to no conduct independent of this failure to

communicate, thus their emotional distress claim must be deemed to arise of out

misrepresentation within the meaning of § 2680(h). We disagree.

"The misrepresentation exception applies only when the action itself falls

within the commonly understood definition of a misrepresentation claim." *Block*

-20-

*v. Neal*, 460 U.S. 289, 296 n.5 (1983) (citations and quotations omitted).  For

purposes of the FTCA, misrepresentation includes those claims "arising out of

negligent, as well as willful, misrepresentation." *United States v. Neustadt*, 366

U.S. 696, 702 (1961).  Negligent misrepresentation, in the "traditional and

commonly understood legal definition of the tort," involves a violation of the

"duty to use due care in obtaining and communicating information upon which [a]

party may reasonably be expected to rely in the conduct of his economic affairs."

*Id.* at 706.  Such claims have "been confined 'very largely to the invasion of

interests of a financial or commercial character, in the course of business

dealings.'" *Block*, 460 U.S. at 296 n.5 (quoting *Neustadt,* 366 U.S. at 711 n.26);

*see also Jimenez-Nieves v. United States*, 682 F.2d 1, 5 (1st Cir. 1982)

("misrepresentation" in the Tort Claims Act should be confined to its traditional,

or core, meaning as a separate tort).

　　In accordance with these rules, circuit courts have held that a claim must

contain the essential elements of misrepresentation to come within the exception.

*See Jimenez-Nieves*, 682 F.2d at 4-5; *Kohn v. United States*, 680 F.2d 922, 926

(2d Cir. 1982) (exception generally has been applied only to actions for damages

due to commercial decisions that were predicated on incorrect or incomplete

information); *Reynolds v. United States*, 643 F.2d 707, 711 (10th Cir. 1981)

(exception applies where plaintiff relies on false representations to his financial

detriment).  Those elements include "reliance by the plaintiff . . . upon the false information that has been provided," and "pecuniary loss."  *Jimenez-Nieves*, 682 F.2d at 4 (citing applicable sections of the Restatement (Second) of Torts).

Furthermore, courts have held that the misrepresentation exception does not bar suits on other grounds in cases in which misrepresentations are collaterally involved.  *See, e.g., Saraw P'ship v. United States*, 67 F.3d 567, 570-71 (5th Cir. 1995) (holding misrepresentation exception does not bar plaintiff's negligence claim where government's lack of communication was collateral to the essential act that spawned the damages).  As the First Circuit said in *Jimenez-Nieves*, "we can discern no congressional purpose that might have been served in defining [misrepresentation] more broadly, to include false statements that are happenstance causal elements of other torts." 682 F.2d at 5.

The government argues the misrepresentations at issue here are more than collaterally involved and constitute the very conduct giving rise to plaintiffs' emotional distress claim.  However, even acknowledging that the government failed to inform the Trentadues of certain facts, we agree with the district court's conclusion that the misrepresentation exception does not apply in this case. Plaintiffs' emotional distress arises from the government's callous treatment of the family in the aftermath of Trentadue's death, including its shipping of Trentadue's battered remains to unsuspecting family members.  Two essential

components of negligent misrepresentation — reliance and pecuniary loss — are not present on the record before us. *See Jimenez-Nieves*, 682 F.2d at 4. Therefore, in our view, the district court correctly found that this is not an action for negligent misrepresentation or deceit under § 2680(h).[5]

Accordingly, we conclude plaintiffs' intentional infliction of emotional distress claim is not barred by the FTCA's misrepresentation exception.

### C. Intentional Infliction of Emotional Distress

The next hurdle faced by the Trentadues is the government's assertion that the district court erred in awarding damages for intentional infliction of emotional distress. Specifically, the government argues plaintiffs' evidence failed to satisfy any of the elements of intentional infliction of emotional distress under Oklahoma law. Whether plaintiffs have proved intentional infliction of emotional distress is a matter of law we review de novo. *See Clark v. Brien*, 59 F.3d 1082, 1086 (10th Cir. 1995).

### 1. The Elements of the Tort

---

[5] *JBP Acquisitions, LP v. United States ex rel. FDIC*, 224 F.3d 1260 (11th Cir. 2000), a case relied on by the government, supports this conclusion. The Eleventh Circuit made clear that the FTCA's misrepresentation exception applies when the essential elements of reliance and pecuniary loss are present. It stated: "[w]ithout the false representation by the Government that it was the owner of the Property, the consent agreement in the condemnation proceedings never would have been consummated, the Property would not have been demolished, and [plaintiff] would have suffered no injury." *Id.* at 1265.

-23-

Oklahoma first recognized intentional infliction of emotional distress as an independent tort in *Breeden v. League Services Corp.*, 575 P.2d 1374 (Okla. 1978). *Breeden* teaches that the cause of action is governed by the narrow standards of the Restatement (Second) of Torts § 46.[6] *Id.* at 1376. To recover damages for intentional infliction of emotional distress a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe. *See Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir. 1991) (applying Oklahoma law); *Computer Publ'n, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002).

The commentary to Restatement § 46 explains that "recklessness" in the first element includes actions that are in "deliberate disregard of a high degree of probability that the emotional distress will follow." Restatement (Second) of Torts § 46 cmt. i.

The second element of the tort requires proof that the tortfeasor's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

---

[6] Section 46 of the Restatement (Second) of Torts provides, in pertinent part: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

-24-

intolerable in a civilized community." *Kraszewski v. Baptist Med. Ctr. of Okla., Inc.*, 916 P.2d 241, 248 n.25 (Okla. 1996) (quoting Restatement (Second) of Torts § 46 cmt. d). Generally, the case is one where "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* at 249 n.25. In addition, whether the tortfeasor's conduct was extreme and outrageous must be considered in the setting in which the conduct occurred. *Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986) (holding that nature of the conduct should not be considered in a sterile setting, detached from the milieu in which it took place); *see also Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1559 (10th Cir. 1995) (applying Oklahoma law and noting that court must focus on the totality of the circumstances).

The third element of an emotional distress claim requires proof that the tortfeasor's conduct caused the plaintiff's emotional distress. *Computer Publ'n*, 49 P.3d at 735.

Finally, the fourth element requires proof that the plaintiff's emotional distress was "so severe that no reasonable [person] could be expected to endure it." *Computer Publ'n*, 49 P.3d at 736 (quoting *Breeden*, 575 P.2d at 1377 n.6). While emotional distress includes "all highly unpleasant mental reactions," it is only where the emotional distress is extreme that liability arises. *Miller v. Miller*, 956 P.2d 887, 901 n.44 (Okla. 1998). "The intensity and the duration of the