IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ESTATE OF KENNETH MICHAEL TRENTADUE; CARMEN AGUILAR TRENTADUE; ESTATE OF WILMA LOU TRENTADUE;[1] ESTATE OF JESSE JAMES TRENTADUE; DONNA TRENTADUE SWEENEY; LEE FREDERICK TRENTADUE; and JESSE CARL TRENTADUE, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  CIV-97-849-L |
| UNITED STATES OF AMERICA; DEPARTMENT OF JUSTICE; FEDERAL BUREAU OF PRISONS; and FEDERAL BUREAU OF INVESTIGATION, | ) ) ) ) ) | |
| Defendants. | ) | |

## SECOND ORDER ON REMAND

### *Background and Scope of Remand*

        This matter is before the court on a second remand from the United States

Court of Appeals for the Tenth Circuit.  Estate of Trentadue, *et al.* v. United

States of America, *et al.*, Nos. 05-6406, 06-6011, 244 Fed. Appx. 874, 2007 WL

2247658, (10th Cir. Aug. 7, 2007) (unpublished) (*Trentadue II*).  Plaintiffs' lawsuit

arises from the August 1995 death of Kenneth Michael Trentadue, a 44 year old

inmate of the Special Housing Unit (SHU) at the Federal Transfer Center (FTC) in

Oklahoma City.  The parties are familiar with the proceedings.  Briefly stated, the

---

        [1]        The Estate of Wilma Lou Trentadue was substituted as a party due to the death of Mrs. Trentadue during the appeal.

court previously ruled in favor of the plaintiffs on their claim for intentional

infliction of emotional distress under the Federal Tort Claims Act (FTCA), and

awarded a total amount of $1.1 million in damages to the individual plaintiffs,

stating, in part:

> Evidence at trial established that the plaintiffs suffered severe emotional
> distress as a result of the reckless way in which they were treated by the
> United States in the aftermath of Trentadue's death.  The court finds that
> plaintiffs' understandable emotional reaction to Trentadue's death was
> needlessly and recklessly intensified by the United States' failure to inform
> the family in advance as to the existence of the extensive injuries on
> Trentadue's body and that an autopsy had been performed.  Throughout
> the trial, the court heard no explanation for defendant's silence in this
> regard.

Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 857 (10th Cir.

2005) (*Trentadue I*) (quoting Order, No. CIV-97-849-L at 23 (W.D. Okla. May 1,

2001)).  The court awarded $250,000 to Trentadue's wife, $200,000 each to his

mother, two brothers, and sister, and $50,000 to his father's estate.

In order to prove intentional infliction of emotional distress in Oklahoma, a

plaintiff must demonstrate that (1) the defendant acted intentionally or recklessly;

(2) the defendant's conduct was extreme and outrageous; (3) the defendant's

conduct caused the emotional distress; and (4) the emotional distress was

severe.  *Trentadue I*, 397 F. 3d at 855-56.  In the first appeal, the Tenth Circuit

held that the court properly determined that plaintiffs proved the first, second, and

third elements of the tort of intentional infliction of emotional distress.  Id. at 857.

According to the Tenth Circuit,

We agree with the district court that the government acted in deliberate disregard of a high probability that its actions would cause the Trentadues emotional distress.  The Trentadues were a grieving family searching for answers in the wake of Kenneth Trentadue's untimely death. BOP's overall treatment of the Trentadue family, including its initial nondisclosure of the unusual circumstances of death, its obstinance concerning authorization for an autopsy, and its failure to inform the Trentadues of the body's battered condition amounted to outrageous conduct that "needlessly and recklessly" intensified the family's emotional distress.

Id. at 857.

On remand, this court is to make certain additional findings specific to each individual plaintiff to support the court's earlier determination that the emotional distress suffered by each plaintiff was severe under Oklahoma law.  The Tenth Circuit's remand orders are limited to further analysis of the fourth element of the tort, namely, whether each individual plaintiff's emotional distress was severe under Oklahoma law.  An individualized severity analysis for the differently situated plaintiffs is called for because:

. . . [F]amily members experienced the death and its aftermath from different vantage points.  For example, the decedent's wife, mother, and sister personally witnessed the unveiling of the unexpectedly bruised and lacerated body of Mr. Trentadue at the California funeral home, while other family members were orally informed of the body's condition.  *Trentadue I*, 397 F.3d at 850.  It has always been the government's position that this is a distinction with a difference.  Although all plaintiffs may have suffered "severe" distress in light of the government's actions, the family members were subjected to different stresses and the severity of each plaintiff's distress therefore requires individualized evaluation.

*Trentadue II*, 244 Fed. Appx. at 876-877 (footnote omitted).  According to the

Tenth Circuit, "[f]urther specificity as to the nature and severity of the harm

suffered by each individual plaintiff will satisfy both our original remand and this

present mandate for additional findings."  Id. at 877.

In *Trentadue I*, 397 F.3d at 856, the Tenth Circuit specifically addressed

the requirements of the fourth element as follows:

> . . .[T]he fourth element requires proof that the plaintiff's emotional distress
> was "so severe that no reasonable [person] could be expected to endure
> it."  Computer Publ'n, [Inc. v. Welton], 49 P.3d [732,] 736 [(Okla. 2002)]
> (quoting Breeden [v. League Services Corp.], 575 P.2d [1374,] 1377 n. 6
> [(Okla. 1978)]).  While emotional distress includes "all highly unpleasant
> mental reactions," it is only where the emotional distress is extreme that
> liability arises.  Miller v. Miller, 956 P.2d 887, 901 n. 44 (Okla. 1998).  "The
> intensity and the duration of the distress are factors to be considered in
> determining its severity."  Breeden, 575 P.2d at 1378 n. 6 (quoting
> Restatement (Second) of Torts § 46 cmt. j).  Moreover, although severe
> distress must be proved, "in many cases the extreme and outrageous
> character of the defendant's conduct is in itself important evidence that the
> distress has existed."  Id.

The Oklahoma Supreme Court has stated:

Emotional distress passes under various names, such as mental suffering,
mental anguish, mental or nervous shock, or the like.  It includes all highly
unpleasant mental reactions, such as fright, horror, grief, shame,
humiliation, embarrassment, anger, chagrin, disappointment, worry, and
nausea.  It is only where it is extreme that the liability arises.  Complete
emotional tranquillity is seldom attainable in this world, and some degree of
transient and trivial emotional distress is a part of the price of living among
people.  The law intervenes only where the distress inflicted is so severe
that no reasonable man could be expected to endure it.

Breeden, 575 P.2d at 1378, n. 6 (quoting Restatement of Torts (Second), § 46

cmt. j).  It has long been established that the right to recover for intentional

infliction of emotional distress is not dependent on physical injury.  Chandler v.

Denton, 741 P.2d 855, 867 (Okla. 1987) (citation omitted).  Expert medical

testimony ordinarily is not required where damages for emotional distress are

present, rather, in most cases jurors, from their own experience, are aware of the

extent and character of the disagreeable emotions that may result from a

defendant's outrageous conduct.  Id.  Courts have traditionally appreciated the

emotional distress caused from grieving a loved one's death and have viewed

grieving family members as emotionally susceptible with respect to their feelings

towards the decedent's remains.  Perry v. Saint Francis Hospital and Medical

Center, Inc., 886 F. Supp. 1551, 1561 (D.Kan. 1995).

There is authority for the proposition that a plaintiff who suffers mental

suffering from viewing an injury to another must show that (1) the plaintiff was

directly physically involved in the incident; (2) the plaintiff was damaged from

actually viewing the injury to another as opposed to learning of the accident later;

and (3) a familiar or other close personal relationship between the plaintiff and the

party whose injury gave rise to the plaintiff's mental anguish.  Kraszewski v.

Baptist Medical Center of Oklahoma, Inc., 916 P.2d 241, 250 (Okla. 1996).

As noted by the Tenth Circuit, Breeden teaches that under Oklahoma law,

the court makes an initial determination of whether severe emotional distress can

be found and the jury determines whether such distress in fact existed.

*Trentadue I*, 397 F.3d at 856, n. 7.  "Since the FTCA portion of this case was tried

to the court, the court made both the initial legal determination of outrageousness

and severe distress, as well as the ultimate findings of injury and liability."  Id.

Thus, the court acted as both judge and jury on plaintiffs' claim for intentional

infliction of emotional distress.

The court is thoroughly familiar with all aspects of this case, having

presided over it since its filing more than one decade ago.  The court had the

opportunity to observe the individual plaintiffs as they testified regarding the

impact the government's actions had on them and other family members.  With

the exception of Jesse James Trentadue –  Kenneth Trentadue's father who had

died before the trial started –  the court was able to give careful attention to the

demeanor of the witnesses as they testified.  At times, the court has found that

the stark words in the transcript fail to adequately reflect the emotional intensity

that pervaded the trial in general and the testimony of Kenneth Trentadue's wife,

siblings, and mother in particular.[2]  In making an individualized evaluation of the

severity of each individual plaintiff's emotional distress, the court has considered

the properly admitted exhibits, and has also revisited the trial transcript,[3]

especially those portions containing the matters tried solely to the court on

---

[2]        "The best and most accurate record is like a dehydrated peach; it has neither the substance nor the flavor of the fruit before it was dried."  Colby v. Klune, *et al.*, 178 F.2d 872, 874 n. 8 (2d Cir. 1949) (citations omitted).

[3]        Hereafter, citations to the trial transcript appear as follows:  "Tr. _____".

plaintiffs' claims against the government.  The court has considered the different

vantage points of the individual plaintiffs in relation to the government's actions.

As pointed out in *Trentadue II*, each family member was subjected to different

stresses.  The court, through its acquired familiarity with the personal

characteristics and testimony of Carmen, Wilma, Donna, Lee, and Jesse

Trentadue has gained, to the extent possible, an understanding of the stresses

they were under.  The court has accepted the Trentadue's testimony that their

family was a close and supportive one, despite Kenneth Trentadue's problems

with the law and his history of drug abuse.

     While the court's task in analyzing the fourth element of plaintiffs' claim in

light of the evidence presented at trial seems quite limited and apparently

straightforward, it must be remembered that at the time of the trial, the allegations

surrounding plaintiffs' claims, including their claim for intentional infliction of

emotional distress, were extremely broad.[4]  Also, the court conducted the non-

---

[4]     For instance, in the "Amended Final Pretrial Report Re: United States" [Doc. No. 999], filed in the month or so before trial, plaintiffs stated that their claim for intentional infliction of emotional distress was based on extreme and/or outrageous acts of misconduct "such as, but not limited to destroying evidence, fabricating evidence, falsifying evidence, threatening of witnesses, intimidating witnesses, bribing or attempting to bribe witnesses, and other acts of obstruction of justice in order to conceal the manner and circumstances of Kenneth Michael Trentadue's death, mutilation of Kenneth Michael Trentadue's body, falsely asserting that Kenneth Michael Trentadue had committed suicide, falsely asserting that the injuries and trauma upon Kenneth Michael Trentadue's body was self-inflicted or implying that those injuries had been done by his family following death, stating that Kenneth Michael Trentadue had killed himself because he had AIDS, altering the transcripts of a telephone conversation Kenneth Michael Trentadue had with his sister-in-law [to] falsely indicate that Trentadue had AIDS, attempting to indict Jesse C. Trentadue and his attorneys, concealing the fact that the Grand Jury investigating Kenneth Michael Trentadue's death concluded on or about August 11, 1997 in order to conceal evidence, destroy evidence and/or otherwise to hide the manner of Trentadue's death, committing perjury or suborning perjury all for the purpose of concealing the manner of Kenneth Michael Trentadue's death, and allowing Kenneth Michael Trentadue's body to remain[ ] hanging after the discovery so that it could be videotaped rather than administering life saving medical attention to Kenneth Michael Trentadue."  Id. at 67-68.

jury trial of plaintiffs' FTCA claims simultaneously with the jury trial of plaintiffs'

Bivens claims and much of the evidence on the various claims overlapped to a

certain extent.  The individual plaintiffs' testimony regarding their damages on the

claims tried solely to the court came at the end of the month-long trial.  Because

of the relative brevity of the family member's testimony to the court, it is

summarized in some detail below.

The court has made every effort to exclude from its consideration any

testimony or other evidence that does not directly support each plaintiff's claim for

damages based on severe emotional distress.  Some of the plaintiffs' testimony is

based on theories such as murder, intentional destruction of evidence, and

conspiracy, that were later found by the court to be unsupported by the evidence

or barred as a matter of law.  To the extent the evidence or testimony reviewed

and summarized by the court includes a reference to any non-compensable real

or perceived injury, the irrelevant evidence has been excluded from the court's

individualized severity analysis and is not a basis for recovery.[5]  As the court

previously explained in its May 1, 2001 Order, the United States is not

responsible for the third-party embalming of Kenneth Trentadue's body and is

also not responsible for the time it took for the family to ultimately receive his

body.  Order, No. CIV-97-849-L at 17 (W.D. Okla. May 1, 2001).  Also, the court's

---

[5]       Where the case is tried to the court without a jury, it is presumed that the court considered
only competent evidence and disregarded that which was incompetent.  United States v. Norman T., 129
F.3d 1099, 1107 (10th Cir. 1997) (citation omitted).

rulings on plaintiffs' claims for emotional distress are not based on actions taken by the United States in connection with the investigation of Trentadue's death. Id., p. 24.  Needless to say, severe emotional distress is not easily or precisely capable of quantification in monetary terms.  The court has attempted to focus on the emotional effect of the BOP's overall treatment of the Trentadue family, including its initial nondisclosure of the unusual circumstances of Kenneth's death, its obstinance concerning authorization for an autopsy, and its failure to inform the Trentadues of the body's battered condition.  With these limitations in mind, the court concludes that the evidence supports a finding that the emotional distress suffered by each individual plaintiff was severe under Oklahoma law.

### *Evidence Presented at Trial*

Jesse Trentadue, an attorney and the oldest child in the Trentadue family, testified that he learned of his younger brother Kenneth Trentadue's death on the morning of August 21, 1997.  Tr. 3105.  Jesse was told by his wife that his mother, Wilma Trentadue, had called to say that she had been informed by the acting warden at the FTC that  "Kenneth had committed suicide."  Id.  Wilma Trentadue told the warden that her son Jesse would be calling, and he did call and speak with Acting Warden Marie Carter that morning.  Tr. 3105-3106. According to Jesse, "Ms. Carter told me that basically there was nothing wrong with him, that he had been last seen by the guards sometime between 12:00 and 1:00 a.m. on the morning of August 21, 1995, and he had been found hanging

9

thereafter from a light fixture in his cell." Tr. 3106. Jesse testified that he "kept asking for details." Tr. 3107. He asked why Kenneth had been in protective custody and "she told me she didn't know." Id. He kept "pressing for more and more details." Id. He spoke with her about having an autopsy done because he knew that autopsies needed to be done within a certain time to be more effective. Id. According to Jesse, Ms. Carter kept telling him that he "couldn't have an autopsy without the written consent of the mother. . . . She was insistent to the point of saying without the written permission from our mother that there would be no autopsy." Id. During that conversation, Jesse "was never told that [Kenneth Trentadue] had already been removed to the Medical Examiner's Office[,]" was "never told that an autopsy had been performed that day[,]" and was "never told that he had any injuries at all." Id. Thus began a series of phone calls, faxes, and letters between Jesse and the FTC regarding permission for an autopsy on the body of Kenneth Trentadue – an autopsy that was already taking place. Jesse was told that without a written power of attorney from their mother, "there would be no autopsy." Tr. 3108. He testified that "each time I was told there would not be an autopsy unless I obtained a power of attorney from my parents." Tr. 3109. He "explained that my father was ill and it would be difficult to get that power of attorney in what I understood the time parameters and autopsy had to be done." Id. He "kept pleading with them to let me send my authorization[,]" but the answer was "no, not without written consent." Id.

Jesse Trentadue prepared the requested power of attorney, had it FedExed to his mother and prepared another Federal Express envelope for delivery to the Federal Transfer Center.  Tr. 3110.  He wrote letters to Ms. Carter explaining that the requested authorizations were on the way, and asking "about funeral arrangements and getting my brother's body home and what, if anything, the federal government would contribute toward those expenses."  Id.  Despite the repeated questioning to Ms. Carter regarding conducting an autopsy, Jesse Trentadue testified that the first time he learned that Kenneth had actually already been autopsied (on the morning of August 21, 1995) was when "we received the body home."  Tr. 3111.  Prior to that, he had "[n]o idea that he had been autopsied."  Id.

Between August 22, 1995 and August 25, 1995, Jesse had received information indicating that he was to contact the attorney for the Bureau of Prisons, Michael Hood, located in Dallas, Texas.  Tr. 3111-3112.  On August 25, 1995, Jesse wrote to Mr. Hood asking questions such as whether there had been a psychological profile on his brother and whether there were any photographs of his body.  He told Mr. Hood that he would be in Dallas and asked if he could visit him personally.  Jesse testified: "I wanted all the information I could get about the death.  We just needed to know.  That's all I was trying to do was find out what happened."  Tr. 3112.  Jesse does not recall a response to his August 25,1995 letter, however, he did receive a letter from Mr. Hood saying that Jesse's request

for information would be treated as a Freedom of Information Act request.  Id.

According to Jesse, he has sent "dozens" of Freedom of Information Act

requests, "most of which have not been responded to."  Tr. 3113.

Kenneth Trentadue's body arrived home in California on Saturday, August

26, 1995.  Id.  Before the body was received in California, Jesse had not heard

from any source that his brother Kenneth was injured in any way other than the

hanging injuries and he had not heard that there had been an autopsy.  Id.  Jesse

testified that, in order to document the injuries to Kenneth's body, photographs

were taken after the funeral on August 29, 1995.[6]  Tr. 3114.  The photographs

taken by the family were admitted as Exhibits 297A, B, D, E, F, G, H, J, K, L, M,

N, and O.  Tr. 3119.[7]  In admitting these photographs, the court stated they were

---

[6]     There is testimony that photographs of Kenneth's body were also taken by his sister
Donna Trentadue Sweeney on the day his body arrived in California, August 26, 1995.  Tr. 3158.  Whether
the photographs were taken on August 26th or 29th, or on both days, there is no evidence to suggest that
the appearance of Kenneth Trentadue's body was materially different on the day of his funeral than it was
on the day it was first received at the funeral home.  The family removed make-up and clothing before the
photos were taken.  Other than removal of the make-up and clothing, the court determines that the
photographs taken by the family accurately depict the condition of the body as it would have been seen
firsthand by any family member.  Of course, it is fair to say that seeing the actual body in person would be
more traumatic than viewing only the pictures of the body.

[7]     Dr. Smialek, a forensic pathologist hired by the defendants as an expert witness, testified
that he had reviewed the photographs taken by the family at the funeral home in California and that he did
not identify any injuries from his review of the photographs that were not identified by Dr. Jordan,
Oklahoma's Chief Medical Examiner, in his autopsy report.  Tr. 3116.  As noted by the court in its earlier
order, the injuries to Trentadue's body were extensive.  According to Dr. Jordan, the autopsy report
prepared by him and entered into evidence accurately documents each and every one of Trentadue's
injuries.  The autopsy report provides the following "pathological diagnosis":
    I.  Recent cutaneous contusions.
        A.  Left posterior temporoparietal region of head (5 x 4 cm.) with peripheral abrasion and
two central lacerations.
            B.  Right posterior tempero-occipital region of head (6 x 4 cm.).
            C.  Forehead above the eye, two lesions (3 x 1 cm.; 1 x 0.5 cm.).
            D.  Left anterior chest (1 x 0.5 cm.).
            E.  Right upper arm near the bicep (3 x 2 cm.).
            F.  Distal left forearm, extensor surface (2.5 x 2.0 cm.), with adjacent abrasion.
            G.  Right upper back (5 x 2 cm.).

relevant because of "the lack of information that the family had that there was even an autopsy performed and that that would have some relevance to their discovery of that and the lack of any injuries at all from what I understand. . . . Mr. Trentadue's testimony is that they had no knowledge of any injuries or that an autopsy had been performed."  Tr. 3119.

Describing what he did after receiving his brother's body, Jesse testified: "First of all, to deal with all of the trauma and condition he was in.  I had to deal with the family, with the funeral.  My father was very sick, and I guess spiritually deflating to the point where he couldn't go [to] the funeral.  We dealt with that first,

---

H.  Immediately above the anal verge (1 x 0.5 cm.).
I.  Right lower extremity, knee (1.5 x 1.5 cm.).
J.  Right lower extremity immediately below the knee cap (1 x 0.5 cm.).
K.  Left lower extremity, medial anterior thigh, two lesions (1 x 1 cm.; 0.5 x 0.5 cm.).
L.  Bottom of left foot, four lesions (up to 1.5 cm.).
II.  Acute lacerations.
A.  Mid-frontal forehead (2 x 0.5 cm.) with large adjacent contusion.
B.  Right lateral neck (6.5 x 1.5 cm.) with underlying soft tissue hemorrhage.
III.  Ligature mark of neck (26 x up to 1.5 cm.); two overlying adjacent linear acute abrasions.
IV.  Petechiae and purpurae of conjunctiva.
V.  Acute to recent abrasions.
A.  Lateral to the right eye.
B.  Bridge of the nose.
C.  Medial right antecubital fossa.
D.  Dorsum of right wrist.
E.  Posterior lower left leg at the level of the ankle (0.5 x 0.5 cm.).
VI.  Bilateral acute contusions of tongue; intramuscular strap muscle hemorrhage.
VII.  Acute fracture of the right tip of the hyoid bone.
VIII.  Older contusions.
A.  Dorsal surface of right hand, third and fourth metacarpal phalangeal joint (2 x 2 cm.; 3 x 2 cm.), dorsal left hand, second and third metacarpal phalangeal joints (2 x 1.5 cm.; 2 x 1 cm.).
B.  Flexure surface of left upper arm bicep area (2 x 1 cm.).
C.  Posterior left arm (4 cm.).
IX.  Arteriosclerotic cardiovascular disease.
X.  Micronodular cirrhosis; splenomegaly.
XI.  Biliary calculi.
Also, evidence established that Trentadue's injuries were unusual for a hanging suicide.  Order, No. CIV-97-849-L at pp. 14-15, 16 (W.D. Okla. May 1, 2001).  Records indicate that at the time Kenneth Trentadue was placed in the SHU at his own request less than 24 hours before his death, the only injury noted on his entire body was a blister on his heel.  Id. at p. 4.

and then we dealt with trying to find some answers to our questions, and I tried

very hard."  Tr. 3119.  Jesse could see that an autopsy had been performed, but

did not know whether it was complete and whether toxicological scans had been

performed.  Tr. 3120.  He "tried and tried" over that weekend to find someone

who would do an autopsy "if we needed one additionally," but he was unable to

find such a person.  Id.

On August 30, 2005, Jesse Trentadue wrote his first letter to Ms. Carter

since seeing his brother's body.  Tr. 3120.  The letter, written to Ms. Carter and

hand-delivered to Mr. Hood in Dallas, accused prison guards of killing his brother.

Tr. 3121. This sequence of events as described by Jesse Trentadue clearly

demonstrates to the court that the viewing of Kenneth Trentadue's battered body

seems to have been the turning point which essentially forever altered the

family's position from a "grieving family searching for answers" to an "angry family

searching for justice for the murder of their loved one."

Jesse Trentadue testified about another letter he sent to Ms. Carter,

enclosing photographs of his brother – "what he looked like when he was alive

with his family."  Tr. 3122.  In explaining his reasoning for sending the letter and

photos, Jesse stated: "I guess I was in a rage at that point in time.  I wanted her

to know that this was a human being, a decent human being.  I was getting no

answers from those people. . . ".  Id.

Jesse Trentadue testified that he traveled to Dallas, to meet with Mr. Hood

and deliver his letter of August 30. Tr. 3123. Then he traveled to Oklahoma City

to meet with the Medical Examiner's Office and the FBI. Id. It is while he was in

Oklahoma City, on September 1, 1995, that he received a copy of the press

release[8] which stated that the death of Kenneth Trentadue had been tentatively

ruled as a suicide. Id. He could not recall if he obtained a copy of the press

release from the FBI or Mr. Rowland.[9] Id. Regarding the press release, Jesse

testified: "That upset me very much. I was under the impression there was an

investigation going on, and I received a press release and there was an article

also in the paper that mirrored the press release." Tr. 3124. At the time Jesse

learned on September 1, 1995 that the press release stated that the injuries to his

brother Kenneth "reflected persistent attempts by him to harm himself[,]" he had

---

[8]     The press release, Trial Exhibit 323, dated September 1, 1995 is entitled "FEDERAL
INMATE DEATH BY APPARENT SUICIDE" and states the following:
        Federal Transfer Center Inmate Vance Paul Brockway aka Kenneth Trentadue, was pronounced
        dead at 5:06 a.m. on 08-21-95. Brockway was serving a 20 year sentence for Armed Robbery of
        a Savings and Loan. This sentence was imposed in March, 1982, in the Southern District of
        California. He was released on parole on 04-21-88, however, a parole violator warrant was issued
        by the U.S. Parole Commission on 12-13-89. He was arrested on the parole violator warrant on
        07-10-95, in San Diego, California and transferred to the Federal Transfer Center on 08-18-95,
        and was placed in a segregation single cell on 08-20-95, at his request. The specific basis for this
        request remains unknown at this time. Death has been tentatively ruled as suicide by
        asphyxiation. Mr. Brockway was found hanging in his cell approximately 20 minutes after the
        previous routine cell check by correctional officers. Other cuts and abrasions found on Mr.
        Brockway's body would indicate persistent attempts by Mr. Brockway to cause himself serious
        injury or death. Permissible items found in the cell would support presumptions that cuts on the
        body were self-inflicted. The case has been routinely referred to the Federal Bureau of
        Investigation in Oklahoma City and Internal Bureau of Prisons investigations continue.

[9]     Kevin Rowland held the position of Chief Investigator for the Medical Examiner's Office in
August of 1995. Tr. 1990.

not been told by anyone, other than Mr. Rowland, that an investigation had been initiated.  Id.

The press release prompted more letters.  Tr. 3125-26.  On September 8, 2005, Jesse Trentadue requested Mr. Hood to "please save any cameras, videotapes, audiotapes or any other recordings of what happened that night."  Tr. 3126.  He received no response.  Id.  In a letter dated September 10, 1995 to Mr. Hood, Jesse Trentadue wrote: "The more detail you can provide on the circumstances of my brother's death and events leading up to his death, the easier it will be for my family to accept the fact that it was a suicide."  Tr. 3128.  He did not receive a response to this letter either.  Id.

During this time, *i.e.*, in the three weeks since Kenneth Trentadue's death, Jesse testified that he was sharing information with his family, namely, his brothers, sister, mother, sister-in-law, and father concerning the status of his investigation into Kenneth's death.  Tr. 3128.  "I was telling them that we weren't receiving anything."  Id.

Jesse Trentadue testified about a February 14, 1996 letter he wrote to Scott J. Bomson, Deputy Regional Counsel for the BOP.  Although the letter was written six months after Kenneth's death - - and six months after the discovery of his injuries and the fact that an autopsy had been performed -- it is important to the court because in the letter, Jesse summarizes his lengthy correspondence with the BOP since his brother's death.  Jesse's own chronology states that on

August 30, 2005, he hand-delivered to Regional Counsel Michael D. Hood "the

photographs we [the family] had taken of my brother's battered body."  Exhibit

414.  The letter states that "**[f]rom this point onward**," *i.e.*, August 30, 1995,

very shortly after the photographs of Kenneth Trentadue's body were taken, "**the**

**relationship between my family and [BOP] becomes noticeably hostile.**"  Id.

(emphasis in original).  Jesse Trentadue testified that the back page of every

page of the February 14, 1996 letter was a picture of Kenneth.  Tr. 3135.  The

first is a family photograph showing Kenneth while he was still alive; the

remaining ten photographs are pictures of Kenneth's injured body that were taken

by the family at the funeral home.  Exhibit 414.  Jesse Trentadue testified that he

attached the pictures to the letter because he "was hoping to shock somebody

into answering."  Tr. 3135.  He further testified:

> By that time my anger was carrying over into my - - into my
> professional and private life.  It was difficult to control it.  It's a lot of people,
> and I don't mean to fault them, would not have pursued this, but it's not in
> our nature to let it go.  And we can't let it go until we know what happened,
> and so every effort was made and I didn't start out being confrontational.  I
> didn't start out writing the letters I eventually wrote.  I started out asking for
> information, providing information if they wanted it.  I just kept hitting
> stonewall after stonewall and the rage and the anger built not only with me,
> but the rest of my family.  We are like that.  We could have handled
> anything if they had told us.  I mean it would have been painful.  It would
> have been hard.  We made that clear from the beginning.  If he killed
> himself, you show us, and we will be out of here.

Tr. 3136.

Jesse testified that the situation "consumed" him and his family.  Tr. 3136.

He testified regarding several ways in which the family used the pictures they had

taken of Kenneth's body.  Exhibit 55 depicts two photographs of a bus stop ad

which prominently displays color photographs of Kenneth Trentadue's dead,

battered body.  From the pictures, it appears that the bus stop ads are quite

large, approximately three feet wide by five feet high.  The ad includes three large

color photographs of Kenneth Trentadue, two taken after his death, and one while

he was living.  The two post-death photos are part of the group of photographs

taken by the family members after Kenneth Trentadue's body was received from

the BOP, one of Kenneth Trentadue in his coffin showing the numerous facial

lacerations, and the other of Kenneth's face and the top portion of his autopsy

scar.  Jesse Trentadue testified:

> So we put together, my entire family, Carmen, my sister, my brother,
> we designed it, my sister went around, and Carmen and fought with local
> communities to put up these bus stop ads.  It was hard because it was so
> shocking and offensive to people.  And it just asked you to write the
> senators and asked them to do something, and to have to go by that ad,
> not buy money [sic], but just to pass by it.

Tr. 3141.

When shown the photograph of the bus stop ads at the trial, Jesse

Trentadue testified that, "It's a very painful thing."  Tr. 3140.  He said his family

also traveled to the Oklahoma City FCI and Washington D.C. numerous times to carry banners and "hand out shirts"[10] they had also designed.  Id.

In addition to Jesse's own testimony to the court during the non-jury portion of the trial, the following excerpts from the deposition of Jesse Trentadue were also admitted as evidence, during the testimony of the government's expert witness Dr. Ron Maris, a suicidologist:

> A.      I mean you talk about, I don't know how you distinguish between physical and emotional when you're depressed all the time you're angry all the time and impatient all the time, you're short with your wife, you're short with your children, you're on the verge of a rage constantly. My law practice is [ - - ] fortunately I have good friends and good partners who understand.
> Q.      Is it a fair statement to say you've been on the edge of rage since August 21, 1995?
> A.      I think it's fair to say I was on rage since about August 27, 1995, when I saw my brother's body.

Tr. 2835-2836.

> Q.      Tell me about the mental health problems that you have been experiencing, and I understand you've identified some of them, but if you could to the best of your ability list them separately.
>
> *         *         *                         *         *         *
>
> A.      It's the anger.  It's the rage.  It's being on point of near exploding all the time.  It's being depressed all the time where you have to make an effort to keep up for your family and your wife.  It's not being able to concentrate.  It's having my brother's - - a picture of my brother's body burned in my brain.  I hit my wife.  I've never touched a woman in my life physically.

---

[10]      The t-shirt designed by the family was admitted as Exhibit 385 and displays a color close-up photograph of Kenneth's battered face.

Tr. 2836-2837.

Lee Frederick Trentadue, Kenneth Trentadue's younger brother, testified that before the time that Kenneth Trentadue's body was returned to the family, he had not heard that Kenneth was injured in any way.  Tr. 3150.  He first learned of the injuries to the body the evening after the body returned when his sister and brother came back from the funeral home.  Id.  He said that his sister Donna and his brother Jesse "were very upset" and that he himself was "in shock."  Tr. 3150-51.[11]  Lee Trentadue testified that Jesse led the family in trying to discover what had happened to Kenneth Trentadue and that Jesse kept the family informed of the progress he was making.  Tr. 3151.  The family relied on Jesse because "he was the oldest and an attorney."  Id.  Prior to the time of trial, Lee Trentadue had heard from the government that Kenneth's injuries were "self inflicted" but had heard no other details.  Tr. 3151-52.  According to Lee, Jesse Trentadue is "obsessed" with finding out what happened to Kenneth Trentadue, and "this has been going on from day one, and it's hour after hour."  Tr. 3152.  Lee's testimony at trial continued:

---

[11]     Although the Tenth Circuit adopts the government's assertion that only Carmen, Donna and Wilma Trentadue were at the funeral home when the body was returned on August 26,1995, see *Trentadue II*, 244 Fed. Appx at 877 (citing *Trentadue I*, 397 F.3d at 850), Lee Trentadue's testimony indicates that his brother Jesse may have also been present.  Plaintiffs have long disagreed with the government's contention that Jesse Trentadue did not view the body until later.  Their Memorandum in Opposition to the Government's Rule 59(e) Motion to Alter or Amend Judgment on Remand [Doc. No. 1276] states that the government's references to the record are taken out of context or incomplete.  "For instance, the Government contends that Jesse C. Trentadue did not view his brother's body until after the funeral on August 29, 1995.  The Court will recall that is not true.  The 29th of August was when Kenneth Michael Trentadue's family, including his brother's [sic] photographed his body.  Prior to that time, the body had been stripped of clothing and make-up and inspected by the Trentadue family."  Doc. No. 1276, p. 7 n. 2.  Jesse's own testimony indicates he was in a rage since seeing his brother's body on about August 27, 1995.  Tr. 2836.

Q.    What has this done to your sister Donna?

A.    She is probably the one that took it the hardest.  She is not the woman she used to be.  I mean she goes into rages now.  And I mean it's getting to the point where I avoid her because she just -- -- these rages are just unbelievable and you know, it's like I don't want to be around her when she goes off on these.

Q.    When I say this, I'm not talking about Kenneth's death, I'm talking about the process of trying to find out what happened; do you understand that?

A.    Yes, it's the years of always being lied to and not being told anything.  She's so desperate for answers that she has been going to see psychics, and they got their hooks in her, and they just bleed her along and tell her you're going to find out this or find out that.  Of course, it never happens.

Tr. 3152.

When asked how his mother Wilma Trentadue was "dealing with this[,]"

Lee testified:

A.    She is becoming really in the last few years paranoid.  She constantly checks the doors and the windows of the house.  Not just like every night, every night for hours at a time.  She goes from one door to the next door back to the other door just rounding like a routine, it's just over and over.

Tr. 3154.  Lee testified that it was hard to watch his sister and mother "fall

apart[.]"  He also stated that he had trouble sleeping and was worried about the

rest of his family.  Id.  He said that the situation "wears you down the year after

year."  Tr. 3155.  The testimony continued:

Q.    Lee, stepping back and looking at your family and looking at yourself, is there life for the Trentadue family outside of this matter concerning Kenneth?

A.     Not really, not any more.  I mean, I'm going to lose my sister over this because she's that close to going crazy.  This has really hit her hard.

Q.     And your brother?

A.     Yeah.

Q.     And your mother?

A.     Yes.

Id.

Kenneth Trentadue's sister, Donna Trentadue Sweeney, testified that she was at the funeral home when Kenneth's body arrived. Tr. 3156.  She was surprised to find that the body was in a coffin.  Tr. 3157.  No one had informed her that "he would be in a suit and all taken care of[.]" Id.  She immediately noticed injuries to Kenneth's body including black and blue knuckles, a cut on the right side of his neck, and a big bruise, stitch, and marks on his left arm.  Id.  They asked the funeral director to take the body and remove the clothing.  The body was later returned on a flat table.  Donna testified that "there was still the cotton from the Y-cut" from the autopsy.  Id.  According to Donna, it was at this time that her mother and Trentadue's wife, Carmen, "tilted him the best they could hold him" while she took pictures.  Tr. 3158.  She testified that she took the pictures because "we weren't informed of the condition of the body.  Nobody prepared us." Id.  She said that once they saw his knuckles, they wanted to see the whole body, not with just the suit.  Id.  After the funeral, Donna, Jesse, and Carmen's brother and uncle returned to the funeral home where Kenneth had

been stripped of clothing.  Tr. 3160.  "As my brother Jesse documented injuries, I

took pictures with my Minolta and video."  Id.

Her testimony continued:

> Q.      What effect has it had on you personally, the inability to [find]
> what you consider to be truth?
> A.      I can accept the truth if it was things were not missing, and it
> was handled right from the beginning.  We were never told how to expect
> his body.  I do remember a comment being made that there wasn't a mark
> on him when he was put in the cell.  But no one told us when we got there
> that, first of all, that the coffin, but the idea of all the marks that you would
> find on his body.
> Q.      Is it fair to say you thought about it everyday since you got his
> body?
> A.      I live it.  It's our life.
> Q.      Tell me about that.  How is it your life?
> A.      Because we talk about it.  We work on it everyday.  It's just there.
> It's trying to find the truth. . . . I've seen it effect [sic] my mother, the whole
> family, my brother Jesse, my brother Lee, Carmen. . . .

Tr. 3161-62.

Wilma Trentadue, Kenneth Trentadue's mother, testified that she helped in

having t-shirts made.  Tr. 3166.  The t-shirt, an example of which was admitted as

Exhibit 385, prominently displays a color picture of one of the photographs the

family members took of Kenneth Trentadue's face at the funeral home after his

body was returned.  Mrs. Trentadue testified that she wore such a t-shirt in

"Washington, D.C., Oklahoma, different places."  Id.  Mrs. Trentadue testified that

she wore the t-shirt with her dead son's picture on the front to try to get people's

attention.  Tr. 3167.  She said that the inability to find out what happened to

Kenneth "just makes stress because you can't seem to get any answers from anybody.  If they had all the evidence and showed it and showed the truth that he did kill himself, then we could accept it.  I could accept it."  Id.  She said that her husband wanted to go with the other family members, but he was not able to because he was very ill.  Id.  Mrs. Trentadue did not testify in any detail regarding her presence at the funeral home when Kenneth's body was first unveiled.

Carmen Trentadue was the wife of Kenneth Trentadue.  She testified they were married February 13, 1988, shortly after he was released from the prison in Lompoc, California.[12]  Tr. 2418.   She is the mother of their son Vito, who was born on June 20, 2005.  Tr. 2432.  At the time of Trentadue's death, Vito was a two-month old baby.[13]   Carmen testified that Vito, who was five years of age at the time of the trial, was "not an age to see any of the pictures or any of the information."  Tr. 3172.  She said, "Some day when he is old enough I'll be able to show him and tell him, but not yet.  I want him to live as normal a life as possible."  Id.  Carmen testified as to her love for her husband, although he was "troubled" with "different problems".  Tr. 3174.  She testified that she thought about Kenneth every day and that she thinks about trying to find out what happened to him every day also.  Tr. 3176.  Although she stated that she didn't sleep much since the case began, she also indicated that her body did not require much sleep.  Tr.

---

[12]      Trentadue was incarcerated from 1981 through 1987 for robbing a savings and loan institution. Tr. 2551.

[13]      Kenneth missed the birth of the baby because he had been arrested.  He first saw Vito, through a county jail window, when Vito was ten days old.  Tr. 2423.

3179-80.  Regarding whether or not she was depressed, Carmen Trentadue

testified that she stayed busy with her job and her son: "What time do I have to be

depressed?  But I do.  Nevertheless, I do feel depressed."  Tr. 3182.

She testified that the first time she saw a counselor after her husband's death,

"they wanted me to go into an isolation place, leave my baby when he was barely

three months old.  I can't afford to do that.  I can't imagine anything probably

more depressing."  Id.  Carmen did not specifically testify regarding viewing her

husband's battered body after it was received at the California funeral home.

### ***Observations and Severity Analysis Common to Several Plaintiffs***

The Tenth Circuit noted in *Trentadue II*, 244 Fed. Appx. at 877 n.2 (citation

omitted) that,

> The district court awarded individual compensation ranging from
> $50,000 to $250,000.  The nonuniform financial awards suggest the district
> court may have already determined plaintiffs suffered harms of differing
> severity.

The individual plaintiff receiving the award at the low end of the range

previously set by the court was Jesse James Trentadue, Kenneth Trentadue's

father.  As previously noted, Kenneth's father died before the time of the trial in

December of 2000 and did not testify at the trial.  The $50,000 was awarded to

the estate of Kenneth's father primarily in recognition of Oklahoma law which

provides that "in many cases the extreme and outrageous character of the

defendant's conduct is in itself important evidence that the distress has existed."

Breeden, 575 P. 2d at 1378 n. 6 (quoting Restatement (Second) of Torts § 46

cmt. j).  The Tenth Circuit found that the court properly determined that plaintiffs proved the second element of the tort of intentional infliction of emotional distress, an element which requires proof that the government's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Trentadue I*, 397 F.3d at 856, 857.  The $50,000 award represents the minimum amount the court finds is necessary to compensate each individual plaintiff for the extreme and outrageous actions of the government in the aftermath of Kenneth Trentadue's death, including the failure to inform the family in advance of the numerous extensive injuries on his body and the fact that an autopsy had been performed.  The court believes the amount of $50,000 reasonably reflects the extreme, atrocious, and intolerable nature of the government's conduct and should be considered as the starting point in the court's consideration of the severity of the harm to each individual plaintiff.

The court has previously described the family member's reaction to the unveiling of Kenneth's injured body in the following way:

> Trial testimony established that news of Trentadue's death came as a shock to his family members. . . . The family was not advised by anyone at the FTC or the BOP that an autopsy had been performed; thus the family was first made aware of the autopsy by viewing the obvious signs of the intrusive procedure on his body after it was received on August 26, 1995. Despite the numerous, unusual, and obvious extensive injuries to Trentadue's body, the family had not been told in advance of these injuries and were thus also forced to discover these on their own, much to their horror.

Order, No. CIV-97-849-L at 16-17 (W.D. Okla. May 1, 2001).  The court believes

that the use of the word "horror" to describe the discovery of the condition of

Kenneth's body is fitting.  The word "horror" is defined as: "1a : painful and

intense fear, dread, or dismay . . .  b : intense aversion or repugnance  2a : the

quality of inspiring horror: repulsive, horrible or dismal quality or character . . . b :

something that inspires horror  3*pl* : a state of extreme depression or

apprehension."  Merriam-Webster's Collegiate Dictionary Tenth Edition (2001) p.

558.  Because Donna Trentadue's photographs were taken so soon after the time

the body was received, the court finds that they are an accurate representation of

Kenneth's body as it appeared at the time of its receipt at the funeral home.  The

court believes that the condition of Kenneth's body as depicted in the

photographs inspired horror in the family members known to have viewed the

body personally, *i.e.*, Carmen, Wilma, Donna, and Jesse Trentadue.  The

photographs are extremely graphic, showing not only "the obvious signs of the

intrusive procedure" of the autopsy, but also the "numerous, unusual, and

obvious extensive injuries to Trentadue's body" referred to by the court in its

previous order.  For anyone not familiar with an autopsy scar, this injury as shown

in the photographs is particularly shocking.  The unpleasant reaction upon seeing

such a scar would be all the more extreme if the viewer was under the

impression, as the Trentadues were, that an autopsy had not been performed.

As stated numerous times, the BOP had obstinately demanded that Jesse

Trentadue obtain the consent of his mother for the autopsy and failed to inform the family in advance that the autopsy had actually been performed.

The other injuries to Kenneth's body are also disturbing.  The photos show numerous bruises and lacerations, literally from the top of his head to the bottoms of his feet.  When Carmen, Wilma and Donna Trentadue saw these injuries for the first time, they had only been told by the BOP that Kenneth had hung himself. It is not disputed that the injuries to Kenneth Trentadue's body were unusual for a hanging.  Whatever injuries a person might expect from a hanging suicide were certainly not what Carmen, Wilma, Donna and Jesse saw when they viewed Kenneth's body at the funeral home.  Based upon the injuries shown in the photographs, the court concludes that the family members who viewed the body firsthand have adequately proven that their emotional distress was so severe that no reasonable person could be expected to endure it.  It is unthinkable to the court that a reasonable person in these plaintiffs' position, and from their vantage point, would not suffer extreme emotional distress upon personally viewing the unexpected injuries depicted in the photographs.  Therefore, the court finds that the evidence supports an award of damages to those members proven to have actually viewed the battered remains of Kenneth Trentadue firsthand, namely Carmen, Wilma, Donna and Jesse Trentadue.

The court believes that the use of the photographs to shock and offend others is in itself evidence that the family members were themselves shocked and

offended by the injuries depicted in the photographs.  The court also finds it

significant that the bus stop ads designed by Jesse, Carmen, Wilma, Donna and

Lee Trentadue, as well as the letter sent by Jesse to the deputy regional counsel

for the BOP, include not only gruesome after-death photos taken at the funeral

home, but also a picture of Kenneth Trentadue as he appeared in life.  This is

significant to the court because it highlights the stark contrast between the way

the family knew and remembered Kenneth and the way they unfortunately viewed

his battered body after his untimely death.

In assessing the severity of the emotional distress suffered by each

plaintiff, the court takes into consideration the fact that Kenneth Trentadues' wife,

sister and mother were the first family members proven to have seen Kenneth

Trentadue's battered body at the California funeral home.  As noted by the Tenth

Circuit, these women "personally witnessed the unveiling" of the body, whereas

"other family members were orally informed of the body's condition."  *Trentadue*

*II*, 244 Fed. Appx. at 877 (citation omitted).  While the evidence supports a finding

that Jesse Trentadue also personally witnessed the condition of his brother's

body at some point between August 26 and 29, 1995, it is unclear as to when he

actually saw the body for the first time.  It is not accurate to suggest that Jesse

Trentadue *only* heard about the injuries to his brother's body from other family

members.  There is, however, no evidence in the record before the court that Lee

Trentadue or Jesse James Trentadue ever personally viewed the body for

themselves.  They may have, there is just no evidence in the record that they did.

Because of this lack of evidence, the court finds that Lee Trentadue and Jesse

James Trentadue should not recover any damages for severe emotional distress

that would arise from actually viewing the battered body of Kenneth Trentadue

firsthand.

Relying on Slayton v. Vansickle, 872 P. 2d 929, 931 (Okla. 1994)[14], the

government has asserted that recovery for emotional distress is not permitted

when a person is not present when the actionable injury occurs.  The government

argues that the "actionable injury" here occurred when the injuries to Trentadue's

body were first discovered by his wife Carmen, mother Wilma, and sister Donna

at the California funeral home. The government has argued that the plaintiffs who

were not present when Trentadue's body arrived at the funeral home (*i.e.*, Jesse,

Lee and Jesse James Trentadue) are not entitled to damages for intentional

infliction of emotional distress resulting from BOP's failure to advise the family in

advance as to the condition of the body. *Trentadue II*, 244 Fed. Appx. at 877; *see

also*, Memorandum in Support of United States' Motion to Alter or Amend Final

Judgment on Remand Pursuant to Fed. R. Civ. P. 59(e) [Doc. No. 1272-2].

The court rejects the argument that Jesse Trentadue should not be allowed

to recover emotional distress damages from viewing his brother's battered

remains, even though he may not have been among the first to view the body.  In

---

[14]      Slayton involved a counterclaim for *negligent* infliction of emotional distress under a type
of bystander theory. *See* 872 P.2d at 931.

Slayton as well as in Kraszewski v. Baptist Medical Center of Oklahoma, Inc., 916

P.2d 241, 250 (Okla. 1996), cited above, the courts emphasized the distinction

between "actually viewing the injury to another" as opposed to, or rather than,

"learning of the accident later."  Under these cases, it appears that recovery is

potentially allowed in cases involving the actual viewing of the injury to another,

however recovery would not appear to be allowed in cases where the alleged

victim only learned of the accident later.  These cases necessarily present an

"either-or" situation, since the underlying actionable injury was the death of

another human being.  Clearly, an accident, including the death of a person, is a

one-time event which cannot be repeated.  Those who are not actual witnesses

to a death must necessarily be told about it later.  Here, to the contrary, the

underlying actionable injury was the viewing of the unexpected injuries and

trauma on Kenneth Trentadue's dead body.  Even a person who was not present

at the initial unveiling of the body could still view the body at a later time.  It is not

an "either-or" proposition since a person could both hear about the injuries on the

body and also view the injuries and trauma firsthand.  Assuming Jesse Trentadue

was not present at the initial unveiling of the body, the court finds that he

nevertheless suffered severe emotional distress as a result of his eventual

viewing of his brother's body.

       To the extent Slayton and  Kraszewski are applicable, the court finds these

cases would not serve as a total bar to recovery of emotional distress damages

by Jesse Trentadue under the facts of this particular case.  Having said that, however, the court does consider the timing of the viewing of the body as a significant factor in assessing damages, and agrees that those who first saw the unexpected injuries to the body may have suffered to a greater extent because of the initial shock of the discovery of the extensive and unexplained injuries.

This is not to suggest, however, that Jesse was not subjected to his own stresses that support a finding that his damages should be at least equal to those who viewed the body first.  The court finds it significant that Ms. Carter, Acting Warden of the BOP, had personally discussed with Jesse Trentadue the hanging death of Kenneth and never mentioned to him in their numerous telephone conversations that Kenneth had sustained an unusual number of injuries – injuries not generally associated with a hanging suicide.  Ms. Carter had also obstinately maintained throughout her many telephone conversations with Jesse that no autopsy would occur without the consent of Kenneth Trentadue's mother. As the family spokesperson, Jesse was the link between the Trentadues and the BOP.  By all accounts, he was initially cooperative with the BOP and complied with every request despite the fact he was dealing with the unexpected news of his brother's death.  Since Jesse was the actual person who spoke with Ms. Carter during this critical time, the court finds that it was all the more shocking for him to see his brother's body with the realization that Ms. Carter had not only failed to mention to him the numerous extensive injuries but also had failed to

inform him that an autopsy had already been performed without the supposed required consent.  The court believes that Jesse's emotional distress from viewing Kenneth's body thus differs in a rather significant way from the other family members and could be said to be as severe as those unfortunate family members who actually viewed the body first.

### Individualized Severity Analysis for Each Individual Plaintiff

### Carmen Trentadue - Wife

In keeping with the court's observations above that each individual plaintiff is entitled to recovery of damages for intentional infliction of emotional distress based on the extreme and outrageous character of the government's conduct, the court finds that Carmen Trentadue should recover $50,000.00, representing the minimum amount the court feels is necessary compensation for this conduct. Further, as it is undisputed that Carmen Trentadue was present when the numerous, extensive, and unexpected injuries to Kenneth's body were first discovered at the California funeral home, the court finds she is entitled to recover an additional amount representing reasonable compensation for personally viewing the numerous, extensive, and unexpected injuries as depicted in the photographs taken by the family at the funeral home.

Trial testimony, more fully summarized above, provided the following personal details the court has also considered in its individualized severity analysis as to Carmen Trentadue:

- Carmen was the mother of a two-month old baby, Vito, at the time of her discovery of the unexplained and numerous injuries on her husband Kenneth's body when it was returned to funeral home
- was present at funeral home when numerous extensive injuries were first discovered and family learned of autopsy without having been warned in advance
- personally viewed the battered remains of her husband as shown in the photographs taken at the funeral home
- at the time of the trial in 2000, thought about what happened to her husband "every day"
- at the time of trial, had not shown her son any disturbing photographs of his father, because she wanted Vito to live "as normal a life as possible"
- although she kept busy, testified she was "depressed"
- chose not to go to counseling after Kenneth's death because she did not want to leave her then 3-month old baby
- loved her husband and testified they shared a loving relationship despite some troubling times
- according to Jesse, the discovery of the unexpected injuries on his brother's body caused hostility between the Trentadue family and the BOP
- Jesse testified that the rage and anger built, not only in him, but in the rest of the family
- Jesse testified that he, along with Carmen, Donna, and Lee used the post-death photographs of Kenneth's body in the bus stop ads they designed, although it was hard because it "was so shocking and offensive to people"

In analyzing the different stresses Carmen was under at the time of her discovery the extensive injuries on her husband's body and that an autopsy had been performed, the court is heavily influenced by the fact that she was the mother of a two-month old baby at the time of the shocking discovery at the California funeral home.  When the court made its initial award to Carmen in the

amount of $250,000.00, the court placed her at the top of the range of damage

awards.  This highest award was made in recognition of the fact that Carmen was

Kenneth's wife and the new mother of their two-month old baby.  The court

believes that Carmen's personal characteristics, unique to her, subjected her to

different stresses sufficient for the court to place her in a category of her own as

far as damages are concerned.  In considering Carmen's demeanor at trial, the

court believes that she tended to minimize the severity of her emotional distress

in an attempt to stay strong for her baby.  It was clear from her testimony,

however, that she suffered greatly after the discovery of the extensive and

unexpected injuries to her husband's body.  The court finds that Carmen suffered

extreme emotional distress due to the actions of the government in failing to

inform the family in advance as to the existence of the extensive injuries on

Kenneth's body and that an autopsy had been performed.  The evidence

supports an award of damages to Carmen Trentadue in the amount of

$250,000.00.

### *Wilma Trentadue - Mother (deceased)*

Pursuant to the court's observations above that each individual plaintiff is

entitled to recovery of damages for intentional infliction of emotional distress

based on the extreme and outrageous character of the government's conduct, the

court finds that the Estate of Wilma Trentadue should recover $50,000.00,

representing the minimum amount the court feels is necessary compensation for

this conduct.  Further, as it is undisputed that Wilma Trentadue was present when the numerous, extensive, and unexpected injuries to Kenneth's body were first discovered at the California funeral home, the court finds her estate is also entitled to recover an additional amount representing reasonable compensation for personally viewing the numerous, extensive, and unexpected injuries as depicted in the photographs taken by the family at the funeral home.

Trial testimony, more fully summarized above, provided the following personal details the court has also considered in its individualized severity analysis as to Wilma Trentadue:

- Wilma Trentadue was Kenneth Trentadue's mother and was the person the BOP first called to report his untimely death
- immediately contacted her son Jesse to deal with the BOP
- was present at funeral home when the numerous extensive injuries were first discovered on her son's body and the family learned of autopsy without having been warned in advance
- personally viewed the battered remains of her son as shown in the photographs taken at the funeral home
- used post-death photo of her son to "get people's attention"
- experienced stress from inability to get answers
- Lee Trentadue testified that his mother Wilma was very paranoid since Kenneth's death
- according to daughter Donna, trying to find the "truth" has affected her mother Wilma
- according to Jesse, the discovery of the unexpected injuries on his brother's body caused hostility between the Trentadue family and the BOP
- Jesse testified that the rage and anger built, not only in him, but in the rest of the family

In analyzing the different stresses the late Mrs. Trentadue was under at the time of her discovery the extensive injuries on her son's body and that an autopsy had been performed, the court gives great weight to the evidence that she was personally present for the unveiling of Kenneth's battered body at the funeral home.  The court finds that Wilma Trentadue suffered extreme emotional distress due to the actions of the government in failing to inform the family in advance as to the existence of the extensive injuries on Kenneth's body and that an autopsy had been performed.  The evidence supports an award of damages to Wilma Trentadue in the total amount of $150,000.00.

### *Jesse James Trentadue - Father (deceased)*

In keeping with the court's observations above that each individual plaintiff is entitled to recovery of damages for intentional infliction of emotional distress based on the extreme and outrageous character of the government's conduct, the court finds that the Estate of Jesse James Trentadue should recover $50,000.00, representing the minimum amount the court feels is necessary compensation for this conduct.  Since there was no evidence presented at trial to demonstrate that Kenneth's father ever personally viewed the numerous, extensive, and unexpected injuries to Kenneth's body at the California funeral home, the court finds he is not entitled to recover damages based on viewing the injuries.

Trial testimony, more fully summarized above, provided the following personal details the court has also considered in its individualized severity analysis as to Jesse James Trentadue:

- was very sick at time of Kenneth's death and, according to Jesse, was "spiritually deflating" to the point he could not attend his son's funeral
- wife Wilma testified that Jesse James Trentadue wanted to go with other family members when they wore t-shirts displaying photographs of Kenneth's battered body, but could not because of bad health
- no evidence he personally viewed Kenneth's battered body
- according to Jesse, the discovery of the unexpected injuries on his brother's body caused hostility between the Trentadue family and the BOP
- Jesse testified that the rage and anger built, not only in him, but in the rest of the family

Other than the $50,000.00 award, discussed above, the court finds that the evidence regarding Mr. Trentadue does not provide a basis for the court to find that he suffered additional emotional distress which could be said to be so severe that not reasonable person could be expected to endure it.

### ***Donna Trentadue Sweeney - Sister***

Consistent with the court's observations above that each individual plaintiff is entitled to recovery of damages for intentional infliction of emotional distress based on the extreme and outrageous character of the government's conduct, the court finds that Donna Trentadue Sweeney should recover $50,000.00, representing the minimum amount the court feels is necessary compensation for

this conduct.  Further, as it is undisputed that Donna Trentadue Sweeney was present when the numerous, extensive, and unexpected injuries to Kenneth's body were first discovered at the California funeral home, the court finds she is entitled to recover an additional amount as reasonable compensation for personally viewing the numerous, extensive, and unexpected injuries as depicted in the photographs taken by the family at the funeral home.

Trial testimony, more fully summarized above, provided the following personal details the court has also considered in its individualized severity analysis as to Donna Trentadue Sweeney:

- was present at funeral home when numerous extensive injuries were first discovered and family learned of autopsy without having been warned in advance
- viewed the battered remains of her brother as shown in the photographs taken at the funeral home
- actually took photographs showing her brother's extensive injuries and autopsy scar
- testified she took pictures because "nobody prepared us"
- Donna's brother Lee testified Donna was "very upset" after returning from the funeral home
- brother Lee described Donna as "falling apart," "desperate," "probably the one that took it the hardest," and "close to going crazy" due to the "years of being lied to and not being told anything"
- according to Jesse, the discovery of the unexpected injuries on his brother's body caused hostility between the Trentadue family and the BOP
- Jesse testified that the rage and anger built, not only in him, but in the rest of the family
- Jesse testified that he, along with Carmen, Donna, and Lee used the post-death photographs of Kenneth's body in the bus stop ads they

designed, although it was hard because it "was so shocking and offensive to people"

The court considers the testimony regarding Donna's mental state in the aftermath of her brother's death as compelling evidence that she suffered extreme emotional distress.  The court does believe that a fair amount of the distress testified to, however, is perhaps more related to her anger over the government's investigation into her brother's death.  Although her displeasure with the government is intense and real, it is not all tied to the government's initial nondisclosure of the injuries to Kenneth's body and that an autopsy had been performed.  However, the court finds it important that she is the one who took the initiative to take pictures of the unexpectedly bruised and lacerated body of her brother once the extensive injuries were discovered.  Rather than dealing with the normal grief associated with the death of her brother, she instead was taking pictures to document his injuries.  The court finds that Donna Trentadue suffered extreme emotional distress due to the actions of the government in failing to inform the family in advance as to the existence of the extensive injuries on Kenneth's body and that an autopsy had been performed.  The evidence supports an award of damages to Donna Trentadue Sweeney in the total amount of $150,000.00.

### *Lee Frederick Trentadue - Brother*

Because the court has found that each individual plaintiff is entitled to recovery of damages for intentional infliction of emotional distress based on the

40

extreme and outrageous character of the government's conduct, the court finds

that Lee Frederick Trentadue should recover $50,000.00, representing the

minimum amount the court feels is necessary compensation for this conduct.

Since there was no evidence presented at trial to demonstrate that Lee

Trentadue ever personally viewed the numerous, extensive, and unexpected

injuries to Kenneth's body at the California funeral home, the court finds he is not

entitled to recover damages based on viewing the injuries.

Trial testimony, more fully summarized above, provided the following

personal details the court has also considered in its individualized severity

analysis as to Lee Frederick Trentadue:

- testified he was "in shock" after learning of extensive injuries to brother Kenneth's body after it was received at the funeral home
- no evidence he personally viewed Kenneth's body
- helped design bus stop ads using photographs of Kenneth's body taken at the funeral home
- according to Jesse, the discovery of the unexpected injuries on his brother's body caused hostility between the Trentadue family and the BOP
- Jesse testified that the rage and anger built, not only in him, but in the rest of the family
- Jesse testified that he, along with Carmen, Donna, and Lee used the post-death photographs of Kenneth's body in the bus stop ads they designed, although it was hard because it "was so shocking and offensive to people"

The court had previously awarded Lee Trentadue $200,000.00, the same

amount his brother, sister, and mother received.  Other than Kenneth Trentadue's

wife, and Jesse James Trentadue who did not testify at all, the remaining

plaintiffs received the identical amount in damages.  In making these consistent

awards, the court felt it was desirable for the remaining living family members to

recover the same amount in damages.  Although Jesse Trentadue acted as the

family spokesperson and testified at greater length and in greater detail than the

other family members, the court does not necessarily believe that indicates that

he suffered a higher level of severe distress than his brother, sister, and mother.

Nevertheless, the severity of emotional distress must be proven.  The evidence

concerning the severity of any emotional distress Lee may have suffered is

simply lacking in the record.  Although he testified he was "in shock" after hearing

about his brother's body's condition, no further details are provided.  As noted,

there is no evidence that he ever personally viewed, firsthand, the numerous

extensive injuries on Kenneth's body discovered by the family at the California

funeral home.  Thus, the court cannot place Lee as an eyewitness to the

shocking injuries shown in the photographs taken by the family at the funeral

home.  Although Lee clearly was familiar with the photographs since he helped

design the bus stop ads, the court cannot say with any certainty that he actually

viewed the injuries depicted in the photographs firsthand.  This does make a

difference to the court since the court strongly feels that viewing the body itself

would elicit a much higher level of severe emotional distress than even seeing the

pictures, which are definitely disturbing.  Accordingly, although the court would

prefer a level of consistency in the awards among Kenneth's siblings and mother,

the court finds that the evidence supports an award to Lee Trentadue in the amount of $100,000.00.

### *Jesse Trentadue - Brother*

In keeping with the court's observations above that each individual plaintiff is entitled to recover damages for intentional infliction of emotional distress based on the extreme and outrageous character of the government's conduct, the court finds that Jesse Trentadue should recover $50,000.00, representing the minimum amount the court feels is necessary compensation for this conduct.  Further, as it is undisputed that Jesse Trentadue personally witnessed the numerous, extensive, and unexpected injuries to Kenneth's body at the California funeral home, the court finds he is entitled to recover an additional amount in damages representing reasonable compensation for personally viewing the numerous, extensive, and unexpected injuries as depicted in the photographs taken by the family at the funeral home.

Trial testimony, more fully summarized above, provided the following personal details the court has also considered in its individualized severity analysis as to Jesse Trentadue:

- acted as spokesperson for the Trentadue family and served as liaison between the family and the BOP
- personally spoke to Acting Warden Marie Carter about Kenneth's death
- was told by Ms. Carter that without consent of Wilma Trentadue, an autopsy would not be performed

- in numerous conversations with Ms. Carter, was never told of injuries to Kenneth's body and was never told that an autopsy had in fact been performed
- because he was not told of the extensive injuries on Kenneth's body and the fact that an autopsy had already been performed, he could not pass this information to his family and they were forced to discover the injuries and trauma on their own
- disruption of normal grieving process during time he was forced to deal with BOP's unnecessary demands for consent for an autopsy that was already being performed
- valid questions of the family, asked through Jesse as the family spokesperson, went unanswered
- testified he was in a "rage" after seeing his brother's body
- testified he was upset to learn information about his brother's death from a press release, after essentially begging for information from the BOP in the days following Kenneth's death
- according to Jesse, the discovery of the unexpected injuries on his brother's body caused hostility between the Trentadue family and the BOP
- used photographs taken by the family at the funeral home depicting the unexpected injuries and trauma to Kenneth's body to "shock" others, including BOP officials
- suffered uncontrollable anger
- became confrontational
- the rage and anger built, not only in him, but in the rest of the family
- the situation concerning Kenneth "consumed" Jesse and his family
- used the photographs of his brother's extensive injuries to shock total strangers
- Jesse testified that he, along with Carmen, Donna, and Lee used the post-death photographs of Kenneth's body in the bus stop ads they designed, although it was hard because it "was so shocking and offensive to people"
- viewing the photographs of Kenneth taken at the funeral home was "very painful" even at the time of trial, five years after Kenneth's death

- testified he was depressed, angry, impatient, and on the verge of rage constantly
- was "on rage since about August 27, 1995, when I saw my brother's body"
- described his mental health problems including anger, rage, "on point of near exploding," depressed, unable to concentrate, and testified that he hit his wife
- Lee Trentadue testified that his brother Jesse was "very upset" after returning from the funeral home after seeing Kenneth's body
- Lee described Jesse as "obsessed"
- Donna testified that trying to find the truth has affected Jesse

The emotional distress suffered by Jesse Trentadue was severe. The court finds that his emotional distress was so severe that no reasonable person could be expected to endure it. He testified that the image of his dead brother is "burned in his brain." His actions after seeing the condition of his battered brother's remains indicate an extremely high level of frustration, anger, confusion, shock, and rage. He has written that his attitude toward the BOP became hostile after seeing his brother's body. Clearly, not being told in advance of the numerous injuries to the body and not being informed in advance that an autopsy had been performed resulted in severe emotional distress. Before he saw the body, Jesse Trentadue's main concern was simply complying with demands of the BOP. He clearly was confused about his brother's untimely death, and by all outward appearances, took charge for the family in arranging for the return of his brother's remains. His valid questions regarding the untimely death of his brother went unanswered. The change in tone in Jesse's correspondence from the time

before the body was viewed and after is dramatic.  There can be no doubt that

the viewing of his brother's body markedly changed Jesse Trentadue.  The court

finds that Jesse Trentadue suffered extreme emotional distress due to the

government's failure to inform the family in advance as to the existence of the

extensive injuries on Kenneth's body and that an autopsy had been performed.

The evidence supports an award of damages to Jesse Trentadue in the total

amount of $200,000.00.

### *Conclusion*

Based upon the evidence presented to the court, the court hereby enters

judgment in favor of plaintiffs and against defendant United States of America on

each individual plaintiff's claim for intentional infliction of emotional distress and

awards damages to the individual plaintiffs as follows:

a.  Carmen Aguilar Trentadue, wife of Kenneth Michael Trentadue, shall

recover the amount of $250,000.00;

b.  The Estate of Wilma Lou Trentadue, mother of Kenneth Michael

Trentadue, shall recover the amount of $150,000.00;

c.  The Estate of Jesse James Trentadue, father of Kenneth Michael

Trentadue, shall recover the amount of $50,000.00;

d.  Donna Trentadue Sweeney, Kenneth Michael Trentadue's sister, shall

recover the amount of $150,000.00;

e. Lee Frederick Trentadue, brother of Kenneth Michael Trentadue, shall recover the amount of $100,000.00;

f.  Jesse C. Trentadue, brother of Kenneth Michael Trentadue, shall recover the amount of $200,000.00.

Judgment in accordance with this Second Order on Remand will issue on a separate document, pursuant to the Federal Rules of Civil Procedure.

It is so ordered this 31st day of March, 2008.

_____
TIM LEONARD
United States District Judge